UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- X

)
)
ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY )
COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE )
COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY )
AND NORTHBROOK INDEMNITY COMPANY, )
)
                                 Plaintiffs, )
)
      -against- )
)
LAZAR YADGAROV, ARTHUR GULKAROV, MEDZANUN GULKAROV, )
GRISHA YADGAROV, SULEYMAN FATTAKHOV, BENZION KRAVIC, )
EDI KALONTAROV, PINCHAS KALANTAROV, OLGA GINDINOVA, )
STELLA DRAGINSKAYA, ALBERT YAKUBOV, VLADIMIR NAZAROV, )
ALISHO FATTAHOV, MARK DANILOVICH, MIKHAIL BOGOMOLNY, )
ALBERT BABADZHANOV a/k/a ALBERT BABADLHANOV, FARID )
PEYSAKHOV, ELAZAR JUSUPOV, VLADIMIR VERBITSKY, UKTAM )
HATAMOV, MICHAIL RUBINOV, RUBEN LEVY, BORIS MOSHEYEV, )
ROBIN GAVRIELOV, DANIL TROFIMOV, JAMSHID SOLEIMANY- )
KASHI, VLADISLAV AGUVAYEV, MICHAEL ZAVRAZHIN, )
KONSTANTIN MARKEVICH, VIKTORIYA FITSAYLO, RAFAEL )
MARKSUNOV a/k/a RAFAEL MAKSUMOV, MARGARITA AKMALOVA, )
MARIFAT DAVLATKHONOVA, OLEG SIMAKOV, GRIGOL )
APRESYANTSI, A-QUALITY MEDICAL SUPPLY CORP., BRIGHT )
MEDICAL SUPPLY, CORP., RANBOW SUPPLY OF N.Y., INC., COMFORT )
SUPPLY, INC., IDEAL MEDICAL SUPPLY, INC., WIOLLA MEDICAL )
SUPPLY, INC., METROPOLITAN MEDICAL SUPPLIES, LLC, SKY )
MEDICAL SUPPLY, INC., HEEL TO TOE FOOT CENTER, LLC, GY )
MEDICAL SUPPLY, INC., ARMADA MEDICAL SUPPLY, INC., SK PRIME )
MEDICAL SUPPLY, INC., NATIONAL MEDICAL & SURGICAL SUPPLY, )
INC., RIGHT AID MEDICAL SUPPLY CORP., GREENWAY MEDICAL )
SUPPLY CORP., ACTIVE CARE MEDICAL SUPPLY CORP., BRAND )
MEDICAL SUPPLY, INC., COMPLETE EQUIPMENT, INC., M&M )
COMPLETE EQUIPMENT, INC., EQUIPLUS, INC., VILLAGE MEDICAL )
SUPPLY, INC., CMS MEDICAL SUPPLY, INC., U&R CITY SUPPLIES, INC., )
CORTLAND MEDICAL SUPPLY, INC., EXPO SUPPLY, INC., QUEST )
SUPPLY, INC., POWER SUPPLY, INC., METRO 8 MEDICAL EQUIPMENT, )
INC., LINDEN EQUIPMENT, INC., METRO HEALTH PRODUCTS, INC., )
XPRESS DISTRIBUTION, INC., FRAZIER TRADING COMPANY INC., )
DEVONIAN INC., MAJOR MARKET MERCHANDISE, INC., MEM )
WHOLESALE, INC., NEECOM DISTRIBUTORS INC., ROPA INC., VIRRA )
WHOLESALE INC., VZ GROUP INC., MEDCURE SUPPLIES INC., )
AMERICAN MOBILITY MEDICAL, INC., HONO OFFICE SUPPLY, INC., )
WEST COAST INC., A TO Z WHOLESALE INC., BULLS EYE )
WHOLESALE, INC., GRIGOL SUPPLY, INC., ONE STOP WHOLESALE, )
INC., TNM WHOLESALE, INC., JOHN DOES 1 THROUGH 20 AND ABC )
CORPORATIONS 1 THROUGH 20, )
)
                                 Defendants. )
)
-------------------------------------------------------------------------- X

CIVIL ACTION
NO:_____

COMPLAINT

(TRIAL BY JURY
DEMANDED)

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company and Northbrook Indemnity Company (collectively "Plaintiffs"), by their attorneys, Stern & Montana, LLP, for their Complaint against Defendants Lazar Yadgarov ("L. Yadgarov"), Arthur Gulkarov ("A. Gulkarov"), Medzanun Gulkarov ("M. Gulkarov"), Grisha Yadgarov, Suleyman Fattakhov ("Fattakhov"), Benzion Kravic ("Kravic"), Edi Kalontarov ("Kalontarov"), Pinchas Kalantarov ("Kalantarov"), Olga Gindinova ("Gindinova"), Stella Draginskaya ("Draginskaya"), Albert Yakubov ("Yakubov"), Vladimir Nazarov ("Nazarov"), Alisho Fattahov ("Fattahov"), Mark Danilovich ("Danilovich"), Mikhail Bogomolny ("Bogomolny"), Albert Babadzhanov a/k/a Albert Babadlhanov ("Babadzhanov"), Farid Peysakhov ("Peysakhov"), Elazar Jusupov ("Jusupov"), Vladimir Verbitsky ("Verbitsky"), Uktam Hatamov ("Hatamov"), Michail Rubinov ("Rubinov"), Ruben Levy ("Levy"), Boris Mosheyev ("Mosheyev"), Robin Gavrielov ("Gavrielov"), Danil Trofimov ("Trofimov"), Jamshid Soleimany-Kashi ("Soleimany-Kashi"), Vladislav Aguvayev ("Aguvayev"), Michael Zavrazhin ("Zavrazhin"), Konstantin Markevich ("Markevich"), Viktoriya Fitsaylo ("Fitsaylo"), Rafael Marksunov a/k/a Rafael Maksumov ("Marksunov"), Margarita Akmalova ("Akmalova"), Marifat Davlatkhonova ("Davlatkhonova"), Oleg Simakov ("Simakov"), Grigol Apresyantsi ("Apresyantsi"), A-Quality Medical Supply Corp. ("A-Quality Medical Supply"), Bright Medical Supply, Corp. ("Bright Medical Supply"), Ranbow Supply of N.Y., Inc. ("Ranbow Supply of N.Y."), Comfort Supply, Inc. ("Comfort Supply"), Ideal Medical Supply, Inc. ("Ideal Medical Supply"), Wiolla Medical Supply, Inc. ("Wiolla Medical Supply"), Metropolitan Medical Supplies, LLC ("Metropolitan Medical Supplies"), Sky Medical Supply, Inc. ("Sky Medical Supply"), Heel To Toe Foot Center, LLC ("Heel To Toe Foot Center"), GY Medical Supply, Inc. ("GY Medical Supply"), Armada Medical

Supply, Inc. ("Armada Medical Supply"), SK Prime Medical Supply, Inc. ("SK Prime Medical Supply"), National Medical & Surgical Supply, Inc. ("National Medical & Surgical Supply"), Right Aid Medical Supply Corp. ("Right Aid Medical Supply"), Greenway Medical Supply Corp. ("Greenway Medical Supply"), Active Care Medical Supply Corp. ("Active Care Medical Supply"), Brand Medical Supply, Inc. ("Brand Medical Supply"), Complete Equipment, Inc. ("Complete Equipment"), M&M Complete Equipment, Inc. ("M&M Complete Equipment"), Equiplus, Inc. ("Equiplus"), Village Medical Supply, Inc. ("Village Medical Supply"), CMS Medical Supply, Inc. ("CMS Medical Supply"), U&R City Supplies, Inc. ("U&R City Supplies"), Cortland Medical Supply, Inc. ("Cortland Medical Supply"), Expo Supply, Inc. ("Expo Supply"), Quest Supply, Inc. ("Quest Supply"), Power Supply, Inc. ("Power Supply"), Metro 8 Medical Equipment, Inc. ("Metro 8 Medical Equipment"), Linden Equipment, Inc. ("Linden Equipment"), Metro Health Products, Inc. ("Metro Health Products"), Xpress Distribution, Inc. ("Xpress Distribution"), Frazier Trading Company Inc. ("Frazier Trading"), Devonian Inc. ("Devonian"), Major Market Merchandise, Inc. ("Major Market Merchandise"), MEM Wholesale, Inc. ("MEM Wholesale"), Neecom Distributors Inc. ("Neecom Distributors"), ROPA Inc. ("ROPA"), VIRRA Wholesale Inc. ("VIRRA Wholesale"), VZ Group Inc. ("VZ Group"), Medcure Supplies Inc. ("Medcure Supplies"), American Mobility Medical, Inc. ("American Mobility Medical"), Hono Office Supply, Inc. ("Hono Office Supply"), West Coast Inc. ("West Coast"), A To Z Wholesale Inc. ("A To Z Wholesale"), Bulls Eye Wholesale, Inc. ("Bulls Eye Wholesale"), Grigol Supply, Inc. ("Grigol Supply"), One Stop Wholesale, Inc. ("One Stop Wholesale"), TNM Wholesale, Inc. ("TNM Wholesale"), John Does 1 through 20, and ABC Corporations 1 through 20 (collectively "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.     On information and belief, beginning in or about May 2000 and continuing through the date of the filing of this Complaint, Defendants engaged in separate, but fundamentally similar massive schemes to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.     This action seeks to recover more than $6,200,000.00 that Defendants stole from Plaintiffs through the submission of thousands of false and/or fraudulent insurance claims for durable medical equipment and supplies ("DME") and/or orthotic devices, including, but not limited to, cervical pillows, cervical traction units, cold/hot water circulating pumps, electronic muscle stimulator ("EMS") units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools, cervical collars and ankle, back, knee, shoulder and wrist braces and supports.

3.     On information and belief, in carrying out their scheme to defraud, Defendants stole millions of dollars from Plaintiffs by submitting, or causing to be submitted, fraudulent claims for persons who allegedly sustained injuries covered by New York's Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law").  Under that law, policyholders and others who sustain injuries in automobile accidents (hereinafter "No-fault Claimants" or "Claimants") can obtain payments from the policyholder's automobile insurance companies for necessary medical care, including treatments, tests and medical equipment ordered by the No-fault Claimant's physicians.  Claimants can also assign those benefits to doctors and other properly licensed healthcare providers, enabling them to bill insurance companies directly for their services.  Defendants exploited that system by obtaining such assignments and then billing insurers for DME and/or orthotic devices that were never provided,

were not provided as billed, or, if provided, were of inferior quality relative to what was represented in the bills submitted to Plaintiffs to have been provided and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Claimants received substantially similar DME and/or orthotic devices. By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet identifying all of the fraudulently billed DME and/or orthotic devices billed by the Defendants.

4.      As used herein, DME generally refers to equipment and/or supplies used for a medical purpose by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses and whirlpools.

5.      As used herein, orthotic devices generally refer to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, ankle braces, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

6.      At all relevant times mentioned herein, each and every DME and/or orthotic device was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.   On information  and belief, and by way of example and not limitation, in furtherance of the scheme to defraud, Greenway Medical Supply, through its owner, entered into a kickback relationship with a No-fault Clinic, not named as a defendant in the Complaint, through which, in exchange for "rent," Greenway maintained a standard supply of DME and/or orthotic devices on-site at the

No-fault Clinic to distribute to the Claimants purportedly receiving treatment at the No-fault Clinic, pursuant to a predetermined course of treatment, irrespective of medical necessity.

7.     At all relevant times mentioned herein, each of the enterprises alleged herein operated in a fundamentally identical manner.  For instance, on information and belief, to execute their scheme to defraud, Defendants L. Yadgarov, A. Gulkarov, M. Gulkarov, Grisha Yadgarov, Fattakhov, Kravic, Kalontarov, Kalantarov, Gindinova, Draginskaya, Yakubov, Nazarov, Fattahov, Danilovich, Bogomolny, Babadzhanov, Peysakhov, Jusupov, Verbitsky, Hatamov, Rubinov, Levy, Mosheyev, Gavrielov and Trofimov (when not referred to individually, referred to collectively herein as the "Retail Owners"), through one or more of the retail medical supply companies, which include Defendants A-Quality Medical Supply, Bright Medical Supply, Ranbow Supply of N.Y., Comfort Supply, Ideal Medical Supply, Wiolla Medical Supply, Metropolitan Medical Supplies, Sky Medical Supply, Heel To Toe Foot Center, GY Medical Supply, Armada Medical Supply, SK Prime Medical Supply, National Medical & Surgical Supply, Right Aid Medical Supply, Greenway Medical Supply, Active Care Medical Supply, Brand Medical Supply, Complete Equipment, M&M Complete Equipment, Equiplus, Village Medical Supply, CMS Medical Supply, U&R City Supplies, Cortland Medical Supply, Expo Supply, Quest Supply, Power Supply, Metro 8 Medical Equipment, Linden Equipment and Metro Health Products, (collectively the "Retailers") (when not referred to individually, the Retail Owners and Retailers are collectively referred to as the "Retail Defendants"), entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bill No-fault insurers for medical services (hereinafter "No-fault Clinics"), one or more wholesale medical supply companies, which include Defendants Xpress Distribution, Frazier Trading, Devonian, Major Market Merchandise, MEM Wholesale, Neecom Distributors, ROPA,

VIRRA Wholesale, VZ Group, Medcure Supplies, American Mobility Medical, Hono Office Supply, West Coast, A to Z Wholesale, Bulls Eye Wholesale, Grigol Supply, One Stop Wholesale, TNM Wholesale and ABC Corporations 1 through 20 (collectively the "Wholesalers") and their owners, including Soleimany-Kashi, Aguvayev, Zavrazhin, Markevich, Fitsaylo, Marksunov, Akmalova, Davlatkhonova, Simakov, Apresyantsi and John Does 1 through 20 (collectively the "Wholesale Owners") (when not referred to individually, the Wholesalers and Wholesale Owners are collectively referred to as the "Wholesale Defendants").

8.     On information and belief, pursuant to these agreements and in exchange for kickbacks and/or other financial compensation, the No-fault Clinics, which are not named as defendants in this action, ensured that (1) their associated doctors and/or chiropractors prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population pursuant to a predetermined course of treatment irrespective of medical necessity; and (2) the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

9.     On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Wholesale Defendants provided the Retailers with inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices.  By way of example, and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet identifying, to the extent known, the Wholesalers that provided the Retailers with inflated invoices.

10.     On information and belief, it was the usual and customary course of business for

prices reflected on wholesale invoices to be grossly inflated for DME and/or orthotic devices. In fact, the wholesale invoices provided typically reflected prices that were up to 10 to 20 times the actual prices that Retailers paid to the Wholesale Defendants. Moreover, oftentimes, the Retailers never actually purchased DME and/or orthotic devices from the Wholesalers, but the Wholesale Defendants provided the Retailers with invoices to create the illusion of a sale. In other instances, the wholesale invoices themselves were transparently fictitious. By way of example and not limitation, irrespective of the Retailer or the DME and/or orthotic devices purportedly purchased, Defendant Medcure Supplies provided the same fictitious wholesale invoice containing a false purchase order number, telephone and facsimile number, which were featured on a wholesale invoice template available from an on-line source.

11.     On information and belief, to create the illusion that the Retailers paid the grossly inflated prices on the wholesale invoices, as more fully alleged in the "Money Laundering Scheme" section below, the Retailers issued checks to the Wholesale Defendants, and other purported wholesalers, for the full amounts reflected on the wholesale invoices. The Retailers then used those checks to demonstrate to Plaintiffs, and others, that they had paid the false wholesale invoice amounts. In reality, on information and belief, the Wholesale Defendants converted the checks they received from the Retailers to cash and secretly returned to the Retailers up to approximately 98% of the wholesale invoice amounts. By way of example and not limitation, in connection with claims 0172676520, 0168100881, 0179766000, 0177677655 and 0177889045, on checks issued by Defendants Fattahov, Hatamov, Yakubov, Levy and Babadzhanov, through Retailers Brand Medical Supply, Expo Supply, National Medical & Surgical Supply, Power Supply and Village Medical Supply to Grigol Supply there were handwritten amounts on the face of the checks for nearly 1.83% of the value on the checks,

which, on information and belief, is consistent with the amounts charged by check cashing establishments to negotiate checks, thereby suggesting that those checks had been negotiated at a check cashing establishment, consistent with the mechanics of the Money Laundering Scheme alleged below.

12.     On information and belief, the covert cash transactions described above were facilitated through various clandestine arrangements among the Retailers, the Wholesale Defendants, check brokers and check cashers.

13.     On information and belief, through these transactions, the Retailers were able to surreptitiously obtain cash, which would, in turn, be used to, among other things, pay kickbacks to the No-fault Clinics from which they purchased prescriptions for DME and/or orthotic devices.

14.     On information and belief, after obtaining the prescriptions from the No-fault Clinics and the inflated invoices from the Wholesale Defendants, the Retail Owners, through their respective Retailers, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the actual amounts they paid for the DME and/or orthotic devices as well as the quality of the items purportedly provided.

15.     On information and belief, at all relevant times mentioned herein, the documents, such as wholesale invoices, submitted by the Retail Owners, through their respective Retailers, to Plaintiffs in support of their fraudulent claims deliberately omitted basic information about the DME and/or orthotic devices, *e.g.*, the manufacturer, make, model, size, features or functions of the item, and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

16.     On information and belief, the wholesale invoices were deliberately vague and

non-descript to conceal the actual make, model, type or quality of the DME and/or orthotic device purportedly provided to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device billed was medically necessary.

17.     On information and belief, the Retail Owners, through their respective Retailers, routinely purchased basic, low-quality and inexpensive items from the Wholesale Defendants, but submitted documents, including, but not limited to, inflated wholesale invoices to insurers, including Plaintiffs, that failed to accurately reflect the actual purchase price of each item.

18.     On information and belief, in support of their claims for reimbursement, and to facilitate the fraud described herein, the Retailer Owners, through their respective Retailers, generated delivery receipts that included a space for the No-fault Claimant's signature to document receipt of each item for which the Retail Owners, through their respective Retailers, billed Plaintiffs.

19.     On information and belief, the Retailers, working with the No-fault Clinics that prescribed the DME and/or orthotic devices, in some instances, arranged for the No-fault Claimants to sign the delivery receipts in blank, thereby allowing the Retail Owners, through their respective Retailers, to fill in the delivery receipt with whatever DME and/or orthotic devices the Retailers wanted to bill to insurers without the No-fault Claimant's actual confirmation that they received the items identified therein.  By way of example, and not limitation, in connection with claims 0175788231, 2127099641, 0177982220, 0175996411 and 0177620002, one or more No-fault Claimants confirmed that they signed blank delivery receipts.

20.     On information and belief, in other instances, where the No-fault Claimant did not sign the delivery receipt, the Retailers, working with the No-fault Clinics, arranged for the No-

fault Claimant's signature to be forged on the delivery receipt, thereby falsely representing that the No-fault Claimant acknowledged receipt of the billed for DME and/or orthotic devices. By way of example, and not limitation, in connection with claims 0177572815, 0179994529, 0167485028, 0176835486, 2127099641, 0181042904, 0174337963, 0179857916 and 0178920864, one or more No-fault Claimants confirmed that the signature on the delivery receipts submitted by the Retailers to Plaintiffs was a forgery.

21.     On information and belief, in these and other ways, Defendants' schemes to defraud operated in a fundamentally similar manner. By way of further example, and not limitation of Defendants' nearly identical parallel schemes to defraud, every Retailer submitted the same type of documentation in support of their claims for reimbursement, including, but not limited to, substantially similar delivery receipts and assignment of benefits forms, containing the same typos, misspellings and stray marks. By way of example, and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims submitted by one or more of the Retailers containing substantially similar delivery receipts and/or assignment of benefits forms that were obviously based on a shared template.

## STATUTORY/REGULATORY SCHEME

22.     Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover from insurers for health service related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules adopted by the Superintendent of Insurance.

23.     Pursuant to the New York Department of Insurance's Regulation 68, which

implemented the No-fault Law, payment for medical expenses must be in accordance with fee schedules promulgated under Section 5108 of the Insurance Law.  11 N.Y.C.R.R. § 65-3.

24.    Effective October 6, 2004, the Department of Insurance, through the Superintendent's promulgation and amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment (the "Fee Schedule"), medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances.

25.    The Amendment to Regulation 83, which was in effect at all relevant times mentioned herein, provides:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the lesser of:  (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F).

26.    Pursuant to Section 5108 (c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

27.    Therefore, pursuant to the No-fault Law and its implementing regulations, providers of DME are entitled to reimbursement in amounts set forth in the Fee Schedule.  In

instances where an item of DME is not set forth in the Fee Schedule, and therefore, there is no established Medicaid fee schedule, the provider is entitled to reimbursement in an amount equal to the *lesser* of the acquisition cost of the medical equipment to the provider, plus 50% or the usual and customary price charged to the public.   11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F).

28.     At all relevant times mentioned herein, nearly each and every bill mailed by the Retail Owners, through their respective Retailers, to Plaintiffs misrepresented the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the DME and/or orthotic device.  In particular, on information and belief, the Retailers, as a matter of pattern and practice, submitted bills to Plaintiffs seeking reimbursement in exorbitant amounts for complex, expensive DME and/or orthotic devices that were never provided, or, if provided, were basic, low-quality pieces of medical equipment for which the Retailers' wholesale cost was a mere fraction of the amount they charged Plaintiffs and/or was provided pursuant to a predetermined course of treatment, irrespective of medical need.

29.     As more fully alleged in the "Fee Schedule Scheme to Defraud" section below, at all relevant times mentioned herein, the Retail Owners, through their respective Retailers, as a matter of pattern and practice, fraudulently submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided or, if provided, did not correspond with the code descriptions in the Fee Schedule for which they sought reimbursement. In that regard, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs seeking reimbursement under codes that had significantly higher reimbursement rates than the codes for the items they actually supplied (hereinafter referred to as "upcoding") and, as a result, the Retail Owners, through the Retailers, were paid substantial sums by Plaintiffs far in excess of the amounts they were otherwise entitled to receive under the No-fault Law.  By way of example, and not limitation,

Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of claims Plaintiffs paid to one or more of the Retailers where the DME and/or orthotic devices were never provided, or if provided, were upcoded.

30.     In addition to fraudulently upcoding bills for the DME and/or orthotic devices actually provided, the Retail Owners, through their respective Retailers, also perpetrated their massive scheme to defraud by submitting bills to Plaintiffs wherein they misrepresented that certain DME were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, they were utilizing codes that were not listed on, or otherwise recognized in, the relevant Fee Schedule (hereinafter "phantom codes").

31.     By submitting to Plaintiffs bills that contained phantom codes or codes that materially misrepresented the nature, quality, and cost of the DME and/or orthotic device, the Retail Owners, through their respective Retailers, deliberately misrepresented the amounts they were entitled to receive under the No-fault Law.

32.     Separate and apart from submitting bills that materially misrepresented the DME and/or orthotic devices purportedly provided through upcoding or by using phantom codes, in furtherance of their scheme to defraud, the Retail Owners, through their respective Retailers, as a matter of practice and procedure also submitted fraudulent bills and supporting documentation for customized DME and/or orthotic devices that were never provided.

33.     On information and belief, to maximize their reimbursement, the Retail Owners, through their respective Retailers, including Active Care Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Cortland Medical Supply, Equiplus, Expo Supply, Greenway Medical Supply, Ideal Medical Supply, Linden Equipment, Metro 8 Medical Equipment, Metro Health Products, National Medical & Surgical Supply, Quest Supply, Right

14

Aid Medical Supply, SK Prime Medical Supply, Sky Medical Supply, U&R City Supplies, Village Medical Supply and Wiolla Medical Supply, submitted bills for, among other things, custom fabricated back and knee braces under various Fee Schedule codes, including but not limited to, codes L0632 and L1844.

34.     To be eligible for reimbursement under codes L0632 and L1844, the Retailers were required to take the specific measurements of the No-fault Claimant, including, where appropriate, height, weight and waist size. By way of example, and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims in which the No-fault Claimants denied having received custom fabricated DME and/or orthotic devices and/or having ever been measured, specially fit, or adjusted for any such item.

35.     In addition to submitting bills for custom fabricated DME and/or orthotic devices that were never provided, the Retail Owners, through their respective Retailers, including Active Care Medical Supply, A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Cortland Medical Supply, Expo Supply, Greenway Medical Supply, Ideal Medical Supply, Linden Equipment, Metro 8 Medical Equipment, Metro Health Products, Power Supply, Quest Supply, Right Aid Medical Supply, SK Prime Medical Supply, U&R City Supplies, Village Medical Supply and Wiolla Medical Supply, submitted bills for back and knee braces, which were not custom fabricated, but required a fitting and adjustment for the No-fault Claimant for whom the items(s) was prescribed under codes L0627 and L1820, among others.

36.     On information and belief, notwithstanding Defendants' routine and systematic submission of bills to Plaintiffs under Fee Schedule codes L0632, L1844, L0627 and L1820, among others, as more fully alleged in the Fee Schedule Scheme to Defraud section below, with

the exception of Complete Equipment, the Retail Owners, through their respective Retailers, did not actually provide the billed for custom fabricated DME and/or orthotic devices as reflected by the fact that they routinely failed to measure the No-fault Claimants and/or did not provide fitting and/or adjustments of the DME to the No-fault Claimants. See Exhibit "5." By way of further example, and not limitation, Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of fraudulent claims paid by Plaintiffs where one or more of the Retailers submitted fraudulent bills for custom fabricated DME and/or orthotic devices that were never provided, not provided as billed or provided pursuant to a predetermined course of treatment without regard to medical necessity.

37.    On information and belief, in numerous other instances, the Retail Owners, through their respective Retailers, intentionally submitted documents containing measurements that they falsely represented pertained to the No-fault Claimant under whose policy they were seeking reimbursement.  In reality, the measurements reflected in the documents submitted to Plaintiffs were entirely artificial and contrived, a fact confirmed through the No-fault Claimants' examinations under oath ("EUO").  By way of example, and not limitation, in connection with claim 0172505224, Defendant Fattahov, through Brand Medical Supply, submitted a measurement form representing that the waist size for a certain No-fault Claimant was thirty-four (34) inches, when in reality, the No-fault Claimant testified during the course of an EUO that no-one had ever taken her measurements prior to giving her any DME and/or orthotic device and that her waist size was forty (40) inches.

38.    On information and belief, in furtherance of the scheme to defraud, Defendants also submitted or caused to be submitted fraudulent bills for DME and/or orthotic devices for which the Fee Schedule does not have a recognized code or permissible charge.  As more fully

set forth in the Non-Fee Schedule Scheme to Defraud section below, at all relevant times mentioned herein, the Retailers, as a matter of pattern and practice, fraudulently submitted bills to Plaintiffs for Non-Fee Schedule DME and/or orthotic devices that were never provided, or if provided, were inexpensive, poor quality items, that Defendants falsely represented were expensive and sophisticated items, when they were not. In furtherance of the scheme to defraud, Defendants also submitted or caused to be submitted fraudulent bills for Non-Fee Schedule items using phantom codes to maximize their reimbursement under the No-fault Law. By way of example, and not limitation, Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims Plaintiffs paid where one or more of the Retail Owners, through their respective Retailers, fraudulently billed for Non-Fee Schedule items.

39. On information and belief, the Defendant DME companies, retailers, and wholesalers alike, were created for the singular purpose of fraudulently billing insurance companies under the No-fault Law.

40. Every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who provided, to the extent any DME and/or orthotic devices were provided, inferior, low-quality items to No-fault Claimants that potentially compromised their health.

41. The duration, scope, and nature of the Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud – although that would be troubling enough – rather, they adopted a fraudulent blueprint as their business plan and used it to participate in a systematic pattern of racketeering activity. Every facet of Defendants' operations, from securing prescriptions for DME and/or orthotic devices

pursuant to a predetermined course of treatment to obtaining inflated wholesale invoices for inexpensive, low quality items to ensuring that No-fault Claimants signed blank delivery receipts falsely representing an acknowledgement of receipt of the billed-for items to generating bills that contained codes not recognized under the relevant Fee Schedule in existence at the time or that misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided was carried out for the purpose of committing fraud.

## NATURE OF THE ACTION

42.    This action is brought pursuant to:

     i)     The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c); and

     ii)    New York State common law.

## NATURE OF RELIEF SOUGHT

43.    Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and their assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

44.    As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $6,200,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that was never provided, or if provided, not provided as billed and/or provided pursuant to a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

### A.     Plaintiffs

45.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

46.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

47.     Plaintiff Allstate Property & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

48.     Plaintiff Allstate Fire & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

49.     Plaintiff Northbrook Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

50.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company and Northbrook Indemnity Company are collectively referred to as "Plaintiffs."

51.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

19

**B.** **The Individual Retail Owner Defendants**

52.    Lazar Yadgarov ("L. Yadgarov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer A-Quality Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

53.    Arthur Gulkarov ("A. Gulkarov") is a natural person residing in the State of New York and is a principal, officer and/or director of Retailer Bright Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

54.    Medzanun Gulkarov ("M. Gulkarov") is a natural person residing in the State of New York and is a principal, officer and/or director of Retailers Bright Medical Supply and Ranbow Supply of N.Y. and, at all times relevant herein, controlled every aspect of their activities.

55.    Grisha Yadgarov is a natural person residing in the State of New York and is a principal, officer and/or director of Retailers Comfort Supply and Ideal Medical Supply and, at all times relevant herein, controlled every aspect of their activities.

56.    Suleyman I Fattakhov ("Fattakhov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Wiolla Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

57.    Benzion A. Kravic ("Kravic") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Metropolitan Medical Supplies and, at all times relevant herein, controlled every aspect of its activities.

58.    Edi Kalontarov ("Kalontarov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Sky Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

59. Pinchas Kalantarov ("Kalantarov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Heel to Toe Foot Center and, at all times relevant herein, controlled every aspect of its activities.

60. Olga Gindinova ("Gindinova") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailers GY Medical Supply and Armada Medical Supply and, at all times relevant herein, controlled every aspect of their activities.

61. Stella Draginskaya ("Draginskaya") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer SK Prime Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

62. Albert Yakubov ("Yakubov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer National Medical & Surgical Supply and, at all times relevant herein, controlled every aspect of its activities.

63. Vladimir Nazarov ("Nazarov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailers Right Aid Medical Supply, Greenway Medical Supply and Active Care Medical Supply and, at all times relevant herein, controlled every aspect of their activities.

64. Alisho Fattahov ("Fattahov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Brand Medical Supply, at all times relevant herein, controlled every aspect of its activities.

65. Mark Danilovich ("Danilovich") is a natural person residing in the State of New York and is a principal, officer and/or director of Retailers Complete Equipment, M&M Complete Equipment and Equiplus and, at all times relevant herein, controlled every aspect of their activities.

66.     Mikhail Bogomolny ("Bogomolny") is a natural person residing in the State of New York and is a principal, officer and/or director of Retailer M&M Complete Equipment and, at all times relevant herein, controlled every aspect of its activities.

67.     Albert Babadzhanov a/k/a Albert Babadlhanov ("Babadzhanov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Village Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

68.     Farid Peysakhov ("Peysakhov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer CMS Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

69.     Elazar Jusupov ("Jusupov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer U&R City Supplies and, at all times relevant herein, controlled every aspect of its activities.

70.     Vladimir Verbitsky ("Verbitsky") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Cortland Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

71.     Uktam Hatamov ("Hatamov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Expo Supply and, at all times relevant herein, controlled every aspect of its activities.

72.     Michail Rubinov ("Rubinov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Quest Supply and, at all times relevant herein, controlled every aspect of its activities.

73.     Ruben Levy ("Levy") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Power Supply and, at all times relevant herein,

controlled every aspect of its activities.

74.     Boris Mosheyev ("Mosheyev") is a natural person residing in the State of New York and is a principal, officer and/or director of Retailer Metro 8 Medical Equipment and, at all times relevant herein, controlled every aspect of its activities.

75.     Robin Gavrielov ("Gavrielov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Linden Equipment and, at all times relevant herein, controlled every aspect of its activities.

76.     Danil Trofimov ("Trofimov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Metro Health Products and, at all times relevant herein, controlled every aspect of its activities.

## C.    The Individual Wholesale Owner Defendants

77.     Jamshid Soleimany-Kashi ("Soleimany-Kashi") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler Xpress Distribution and, at all times relevant herein, controlled every aspect of its activities.

78.     Vladislav Aguvayev ("Aguvayev") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler Frazier Trading and, at all times relevant herein, controlled every aspect of its activities.

79.     Michael Zavrazhin ("Zavrazhin") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesalers Devonian, Major Market Merchandise and MEM Wholesale and, at all times relevant herein, controlled every aspect of their activities.

80.     Konstantin Markevich ("Markevich") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler Neecom Distributors and, at

all times relevant herein, controlled every aspect of its activities.

81.     Viktoriya Fitsaylo ("Fitsaylo") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler VIRRA Wholesale and, at all times relevant herein, controlled every aspect of its activities.

82.     Rafael Marksunov a/k/a Rafael Maksumov ("Marksunov") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler Medcure Supplies and, at all times relevant herein, controlled every aspect of its activities.

83.     Margarita Akmalova ("Akmalova") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler American Mobility Medical and, at all times relevant herein, controlled every aspect of its activities.

84.     Marifat Davlatkhonova ("Davlatkhonova") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler Hono Office Supply and, at all times relevant herein, controlled every aspect of its activities.

85.     Oleg Simakov ("Simakov") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler A to Z Wholesale and, at all times relevant herein, controlled every aspect of its activities.

86.     Grigol Apresyantsi ("Apresyantsi") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesaler Grigol Supply and, at all times relevant herein, controlled every aspect of its activities.

**D.     The Corporate Retailer Defendants**

87.     On information and belief, A-Quality Medical Supply Corp. ("A-Quality Medical Supply") was incorporated on May 23, 2000, and is retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 63-52 108th

Street, Queens, New York 11375. A-Quality Medical Supply is owned, controlled and/or operated by Defendant L. Yadgarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

88.     On information and belief, Bright Medical Supply, Corp. ("Bright Medical Supply") was incorporated on April 27, 2001, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 96-01 Metropolitan Avenue, Forest Hills, New York 11375. Bright Medical Supply is owned, controlled and/or operated by Defendants A. Gulkarov and M. Gulkarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

89.     On information and belief, Ranbow Supply of N.Y., Inc. ("Ranbow Supply of N.Y.") was incorporated on April 14, 2005, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 63-22 Austin Street, Rego Park, New York 11374. Ranbow Supply of N.Y. is owned, controlled and/or operated by Defendant M. Gulkarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

90.     On information and belief, Comfort Supply, Inc. ("Comfort Supply") was incorporated on July 20, 2005, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 69-04 Fresh Meadows Lane, Fresh Meadows, New York 11366. Comfort Supply is owned, controlled and/or operated by Defendant Grisha Yadgarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotics under the No-fault Law.

91.     On information and belief, Ideal Medical Supply, Inc. ("Ideal Medical Supply")

25

was incorporated on November 16, 2007, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 116-07 Myrtle Avenue, Richmond Hill, New York 11418. Ideal Medical Supply is owned, controlled and/or operated by Defendant Grisha Yadgarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

92.     On information and belief, Wiolla Medical Supply, Inc. ("Wiolla Medical Supply") was incorporated on August 1, 2002, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 69-40 Cooper Avenue, Ridgewood, New York 11385.  Wiolla Medical Supply is owned, controlled and/or operated by Defendant Fattakhov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

93.     On information and belief, Metropolitan Medical Supplies, LLC ("Metropolitan Medical Supplies") was incorporated on March 21, 2006, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 7314 15th Avenue, Brooklyn, New York 11228.  Metropolitan Medical Supplies is owned, controlled and/or operated by Defendant Kravic and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

94.     On information and belief, Sky Medical Supply, Inc. ("Sky Medical Supply") was incorporated on September 29, 2006, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 68-27 78th Street, Middle Village, New York 11379.  Sky Medical Supply is owned, controlled and/or operated by Defendant Kalontarov and, on information and belief, has submitted fraudulent

claims to Plaintiffs for reimbursement of DME and/or orthotics under the No-fault Law.

95.     On information and belief, Heel to Toe Foot Center, LLC ("Heel to Toe Foot Center") was incorporated on December 31, 2006, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 3555 East Tremont Avenue, Bronx, New York 10465. Heel to Toe Foot Center is owned, controlled and/or operated by Defendant Kalantarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

96.     On information and belief, GY Medical Supply, Inc. ("GY Medical Supply") was incorporated on October 5, 2007, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 3713 Nautilus Avenue, Brooklyn, New York 11224. GY Medical Supply is owned, controlled and/or operated by Defendant Gindinova and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

97.     On information and belief, Armada Medical Supply, Inc. ("Armada Medical Supply") was incorporated on April 18, 2008, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 3713 Nautilus Avenue, Brooklyn, New York 11224.  Armada Medical Supply is owned, controlled and/or operated by Defendant Gindinova and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

98.     On information and belief, SK Prime Medical Supply, Inc. ("SK Prime Medical Supply") was incorporated on November 7, 2007, and is a retail DME supply company

authorized to do business in the State of New York, with its principal place of business located at 1812 76 Street, Brooklyn, New York 11214. SK Prime Medical Supply is owned, controlled and/or operated by Defendant Draginskaya and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

99.     On information and belief, National Medical & Surgical Supply, Inc. ("National Medical & Surgical Supply") was incorporated on February 7, 2008, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 180-14 Union Turnpike, Jamaica Estates, New York 11366. National Medical & Surgical Supply is owned, controlled and/or operated by Defendant Yakubov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

100.    On information and belief, Right Aid Medical Supply, Inc. ("Right Aid Medical Supply") was incorporated on August 20, 2008, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 2106 East 23rd Street, Brooklyn, New York 11229. Right Aid Medical Supply is owned, controlled and/or operated by Defendant Nazarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

101.    On information and belief, Greenway Medical Supply Corp. ("Greenway Medical Supply") was incorporated on January 6, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 2570 86th Street, Brooklyn, New York 11214. Greenway Medical Supply is owned, controlled

and/or operated by Defendant Nazarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

102. On information and belief, Active Care Medical Supply Corp. ("Active Care Medical Supply") was incorporated on July 14, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 8100 River Road, Apartment 118, North Bergen, New Jersey 07047. Active Care Medical Supply is owned, controlled and/or operated by Defendant Nazarov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

103. On information and belief, Brand Medical Supply, Inc. ("Brand Medical Supply") was incorporated on October 7, 2008, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 66-37 Myrtle Avenue, Glendale, New York 11385. Brand Medical Supply is owned, controlled and/or operated by Defendant Fattahov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

104. On information and belief, Complete Equipment, Inc. ("Complete Equipment") was incorporated on November 10, 2008, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 8776 Bay 16 Street, Brooklyn, New York 11214. Complete Equipment is owned, controlled and/or operated by Defendant Danilovich and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

105. On information and belief, M&M Complete Equipment, Inc. ("M&M Complete Equipment") was incorporated on June 2, 2010, and is a retail DME supply company authorized

to do business in the State of New York, with its principal place of business located at 1716 Bath Avenue, Brooklyn, New York 11214. M&M Complete Equipment is owned, controlled and/or operated by Defendants Danilovich & Bogomolny and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-Fault Law. The bills submitted on behalf of M&M Complete Equipment were submitted by Gerard Tanella, an attorney who was found to be guilty of professional misconduct by the Supreme Court of the State of New York and was summarily suspended from the practice of law, in part, due to his serving as a front for laypersons who actually controlled his law practice and did No-fault collection work on behalf of medical providers.

106. On information and belief, Equiplus, Inc. ("Equiplus") was incorporated on October 28, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 432 Avenue P, Brooklyn, New York 11223. Equiplus is owned, controlled and/or operated by Defendant Danilovich and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

107. On information and belief, Village Medical Supply, Inc. ("Village Medical Supply") was incorporated on April 27, 2009, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 64-74 Dry Harbour Road, Middle Village, New York 11379. Village Medical Supply is owned, controlled and/or operated by Defendant Babadzhanov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-Fault Law.

108. On information and belief, CMS Medical Supply, Inc. ("CMS Medical Supply")

was incorporated on May 6, 2009, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 80-10 162 Street, Queens, New York 11367. CMS Medical Supply is owned, controlled and/or operated by Defendant Peysakhov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

109.    On information and belief, U&R City Supplies, Inc. ("U&R City Supplies") was incorporated on July 7, 2009, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 38-08 43 Avenue, Long Island City, New York 11101. U&R City Supplies is owned, controlled and/or operated by Defendant Jusupov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

110.    On information and belief, Cortland Medical Supply, Inc. ("Cortland Medical Supply") was incorporated on July 21, 2009, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 2855 Cropsey Avenue, Brooklyn, New York 11214. Cortland Medical Supply is owned, controlled and/or operated by Defendant Verbitsky and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

111.    On information and belief, Expo Supply, Inc. ("Expo Supply") was incorporated on January 19, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 211 Nassau Avenue, Brooklyn, New York 11222. Expo Supply is owned, controlled and/or operated by Defendant Hatamov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

112.    On information and belief, Quest Supply, Inc. ("Quest Supply") was incorporated on May 28, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 24-16 34th Avenue, Long Island City, New York 11106.  Quest Supply is owned, controlled and/or operated by Defendant Rubinov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

113.    On information and belief, Power Supply, Inc. ("Power Supply") was incorporated on August 5, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 737A Myrtle Avenue, Brooklyn, New York 11205.  Power Supply is owned, controlled and/or operated by Defendant Levy and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

114.    On information and belief, Metro 8 Medical Equipment, Inc. ("Metro 8 Medical Equipment") was incorporated on November 30, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 93-49 71st Drive, Forest Hills, New York 11375.  Metro 8 Medical Equipment is owned, controlled and/or operated by Defendant Mosheyev and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

115.    On information and belief, Linden Equipment, Inc. ("Linden Equipment") was incorporated on December 16, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 146-02 Liberty Avenue, Jamaica, New York 11435.  Linden Equipment is owned, controlled and/or operated by

32

Defendant Gavrielov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

116.    On information and belief, Metro Health Products, Inc. ("Metro Health Products") was incorporated on March 7, 2011, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 2114 East 27th Street, Brooklyn, New York 11229. Metro Health Products is owned, controlled and/or operated by Defendant Trofimov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

### E.    The Corporate Wholesale Defendants

117.    On information and belief, Xpress Distribution Inc. ("Xpress Distribution") was incorporated on October 15, 1997, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 69-07 69th Place, Glendale, New York 11385. Xpress Distribution is owned, controlled and/or operated by Defendant Soleimany-Kashi and, on information and belief, supplies Retailer National Medical & Surgical Supply and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

118.    On information and belief, Frazier Trading Co., Inc. ("Frazier Trading") was incorporated on June 2, 2005, and is a wholesale DME supply company authorized to do

business in the State of New York, with its principal place of business located at 2700 Stillwell Avenue, Brooklyn, New York 11224. Frazier Trading is owned, controlled and/or operated by Defendant Aguvayev and, on information and belief, supplies Retailers Sky Medical Supply, Comfort Supply, Ideal Medical Supply, Ranbow Supply of N.Y. and National Medical & Surgical Supply and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

119. On information and belief, Devonian Inc. ("Devonian") was incorporated on September 26, 2005, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 2294 E 14th Street, Brooklyn, New York 11229. Devonian is owned, controlled and/or operated by Defendant Zavrazhin and, on information and belief, supplies Retailer Metropolitan Medical Supplies, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

120. On information and belief, Major Market Merchandise, Inc. ("Major Market Merchandise") was incorporated on August 10, 2007, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 2369 81st Street, Brooklyn, New York 11214. Major Market Merchandise is owned, controlled and/or operated by Defendant Zavrazhin and, on information and belief, supplies Retailer SK Prime Medical Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

121. On information and belief, MEM Wholesale, Inc. ("MEM Wholesale") was incorporated on July 20, 2010, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 2369 81st Street, Brooklyn, New York 11214. MEM Wholesale is owned, controlled, and/or operated by Defendant Zavrazhin and, on information and belief, supplies Retailer SK Prime Medical Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable

information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

122. On information and belief, Neecom Distributors, Inc. ("Neecom Distributors") was incorporated on January 17, 2007, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 7822 20th Avenue, #142, Brooklyn, New York 11214. Neecom Distributors is owned, controlled and/or operated by Defendant Markevich and, on information and belief, supplies Retailer Comfort Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

123. On information and belief, ROPA Inc. ("ROPA") was incorporated on August 17, 2007, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 1811 Stillwell Avenue, Brooklyn, New York 11223. ROPA is owned, controlled and/or operated by Defendant John Doe 1 and, on information and belief, supplies Retailers Armada Medical Supply and GY Medical Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and

(2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

124. On information and belief, VIRRA Wholesale Inc. ("VIRRA Wholesale") was incorporated on March 31, 2008, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 2618 Avenue Y, Brooklyn, New York 11235. VIRRA Wholesale is owned, controlled and/or operated by Defendant Fitsaylo and, on information and belief, supplies Retailer Armada Medical Supply and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

125. On information and belief, VZ Group, Inc. ("VZ Group") was incorporated on September 18, 2008, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 2753 Harway Avenue, Brooklyn, NY 11214-5538. VZ Group is owned, controlled and/or operated by John Doe 2 and, on information and belief, supplies Retailers Quest Supply, Expo Supply, National Medical & Surgical Supply, Power Supply and Wiolla Medical Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic

devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

126. On information and belief, Medcure Supplies, Inc. ("Medcure Supplies") was incorporated on February 9, 2009, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 73-20 Austin Street #4F, Forest Hills, New York, 11375. Medcure Supplies is owned, controlled and/or operated by Defendant Marksunov and, on information and belief, supplies Retailers Sky Medical Supply and National Medical & Surgical Supply, as well as other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

127. On information and belief, American Mobility Medical, Inc. ("American Mobility Medical") was incorporated on March 9, 2009, and is a wholesale DME supply company authorized to do business in the State of Florida, with its principal place of business located at 3363 NE 163 Rd Street, Suite # 804, Sunny Isles, Florida 33160. American Mobility Medical is owned, controlled and/or operated by Defendant Akmalova and, on information and belief,

supplies Retailer Equiplus and other retailers unknown to Plaintiffs with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

128. On information and belief, Hono Office Supply, Inc. ("Hono Office Supply") was incorporated on August 19, 2009, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 2534 East 12th Street, Suite #2, Brooklyn, New York 11235. Hono Office Supply is owned, controlled and/or operated by Defendant Davlatkhonova and, on information and belief, supplies Retailer National Medical & Surgical Supply and other retailers unknown to Plaintiffs with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

129. On information and belief, West Coast Inc. ("West Coast") was incorporated on August 27, 2009, and is a wholesale DME supply company authorized to do business in the State

of New York, with its principal place of business located at 177 West End Avenue, Brooklyn, New York 11235. West Coast is owned, controlled and/or operated by Defendant John Doe 3 and, on information and belief, supplies Retailer Complete Equipment and other retailers unknown to Plaintiffs with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

130. On information and belief, A to Z Wholesale, Inc. ("A to Z Wholesale") was incorporated on September 23, 2009, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 118 Olympia Blvd., Staten Island, New York 10305. A to Z Wholesale is owned, controlled and/or operated by Defendant Simakov and, on information and belief, supplies Retailers Expo Supply and CMS Medical Supply, as well as other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

131. On information and belief, Bulls Eye Wholesale, Inc. ("Bulls Eye Wholesale") was incorporated on February 10, 2010, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 184 Robin Road, Staten Island, New York 10305. Bulls Eye Wholesale is owned, controlled and/or operated by John Doe 4 and, on information and belief, supplies Retailer Metro 8 Medical Equipment and other retailers unknown to Plaintiffs with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

132. On information and belief, Grigol Supply, Inc. ("Grigol Supply") was incorporated on March 18, 2010, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 1479 Dahill Rd. Ste #A4, Brooklyn, New York 11204. Grigol Supply is owned, controlled and/or operated by Defendant Apresyantsi and, on information and belief, supplies Retailers Brand Medical Supply, Village Medical Supply, Expo Supply, National Medical & Surgical Supply and Power Supply, as well as other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable

information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

133.    On information and belief, One Stop Wholesale, Inc. ("One Stop Wholesale") was incorporated on November 18, 2010, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 309 Sand Lane, 2nd Floor Front, Staten Island, NY 10305.  One Stop Wholesale is owned, controlled, and/or operated by John Doe 5 and, on information and belief, supplies Retailers Metro 8 Medical Equipment and Linden Equipment, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers.  These wholesale invoices:  (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

134.    On information and belief, TNM Wholesale, Inc. ("TNM Wholesale") was incorporated on March 2, 2011, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 133 Avenue S, Brooklyn, NY 11223.  TNM Wholesale is owned, controlled, and/or operated by John Doe 6 and, on information and belief, supplies Retailers Wiolla Medical Supply, Metro Health Products and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers.  These wholesale invoices:  (1)

42

misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

**F.**     **The John Doe Defendants**

135.    John Doe 1 is the principal, officer and/or director of Wholesaler ROPA and, at all relevant times mentioned herein, controlled every aspect of its activities.

136.    John Doe 2 is the principal, officer and/or director of Wholesaler VZ Group and, at all relevant times mentioned herein, controlled every aspect of its activities.

137.    John Doe 3 is the principal, officer and/or director of Wholesaler West Coast and, at all relevant times mentioned herein, controlled every aspect of its activities.

138.    John Doe 4 is the principal, officer and/or director of Wholesaler Bulls Eye Wholesale and, at all relevant times mentioned herein, controlled every aspect of its activities.

139.    John Doe 5 is the principal, officer and/or director of Wholesale Defendant One Stop Wholesale and, at all relevant times mentioned herein, controlled every aspect of its activities.

140.    John Doe 6 is the principal, officer and/or director of Wholesale Defendant TNM Wholesale and, at all relevant times mentioned herein, controlled every aspect of its activities.

141.    On information and belief, John Does 7 through 20 are the principals, officers and/or directors of one or more of the ABC Corporations 1 through 20 and, at all relevant times mentioned herein, controlled every aspect of their activities.  On information and belief, John Doe Defendants 7 through 20, through the ABC Corporations 1 through 20, entered into kickback and/or other financial compensation agreements with one or more of the Retailers to

provide inexpensive DME and/or orthotic devices and fraudulent wholesale invoices that enabled the Retailers to fraudulently bill Plaintiffs. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

## G.    The ABC Corporations

142.    On information and belief, the ABC Corporations 1 through 20 are additional corporations that purport to be wholesale DME supply companies that supply the Retailers with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers can, in turn, submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement. These ABC Corporations 1 through 20 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

143.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § l332(a)(l) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

144.    Pursuant to 28 U.S.C. §§ 1331, this Court also has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States, and under principles of pendent jurisdiction.

145.    This Court also has supplemental jurisdiction over the claims arising under state

law pursuant to 28 U.S.C. § 1367(a).

146.    Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

147.    Plaintiffs underwrite automobile insurance in New York State.

148.    Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law (popularly known as the "No-fault Law") §§ 5101, *et seq.*, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians ("Covered Persons") that arise from the use or operation of such motor vehicles in the State of New York.

149.    On information and belief, the Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for their services, the Retailers accept assignments of benefits from the patients covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

150.    In purported compliance with the No-fault Law and 11 N.Y.C.R.R. 65 *et seq.*, the Retailers submitted proof of their claims to Plaintiffs, using the claim form prescribed by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3") or a substantially similar form.

151.    Pursuant to Section 403 of the New York State Insurance Law, the claim forms

submitted to Plaintiffs by the Retailers contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

152.    To process and verify claims submitted by the Retailers, Plaintiffs required, and the Retailers submitted, prescriptions for DME and/or orthotic devices, receipts confirming delivery of the billed for DME and/or orthotic devices and other documents relative to the DME and/or orthotic devices allegedly supplied to No-fault claimants for which the Retailers were seeking reimbursement from Plaintiffs.

153.    On information and belief, Retailers Armada Medical Supply, Brand Medical Supply, CMS Medical Supply, Comfort Supply, Complete Equipment, Equiplus, Expo Supply, GY Medical Supply, Metro 8 Medical Equipment, Metropolitan Medical Supplies, National Medical & Surgical Supply, Power Medical Supply, Quest Medical Supply, Ranbow Supply of N.Y., SK Prime Medical Supply, Sky Medical Supply, Village Medical Supply and Wiolla Medical Supply also submitted wholesale invoices to Plaintiffs in support of their claims for reimbursement.

154.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process claims within 30 days of receipt of proof of claim.

155.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by the Retailers in support of their claims and paid the Retailers based on the representations and information that Defendants mailed to Plaintiffs.

156.    The New York State Medicaid program has established limits on the maximum permissible charges for, among other things, DME and/or orthotic devices.  These limits are

listed on the New York State DME Services Fee Schedule.

157.     Effective October 6, 2004, the Superintendent of Insurance adopted the Medicaid Fee Schedule for the reimbursement of DME and/or medical supplies through the 28th amendment to Regulation 83 by providing that "the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided." 11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (hereinafter "Fee Schedule Items").

158.     With respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee payable for the specific item (hereinafter "Non-Fee Schedule Items"), the Department of Insurance regulation provides that the fee payable shall be the lesser of:

(1)     the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2)     the usual and customary price charged to the general public.

11 N.Y.C.R.R § 68 (Appendix 17-C, Part F).

159.     On information and belief, the Retailers were created as the centerpieces of an elaborate scheme to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices that were never provided, were not provided as billed, or, if provided, were either of inferior quality relative to what was included in the bills submitted to Plaintiffs and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all No-fault Claimants received substantially similar DME and/or orthotic devices.

160.     The services that the Retailers purported to provide, and for which they billed

47

Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not

change based on any differences in the patients' conditions. Instead, the Retail Owners, through

their respective Retailers, created a billing apparatus that was designed to drain the maximum

amount of dollars from insurance companies for each and every patient, including those who

required little or no DME at all.

161.    The Retailers created and controlled by the Retail Owners were part of separate,

but well-organized illegal enterprises that engaged in fundamentally similar, systematic, and

pervasive fraudulent practices that distinguished them from legitimate providers of DME and/or

orthotic devices.    On information and belief, the components of each enterprise followed

practices that were part of a racketeering scheme dictated by the Retail Owners, including, but

not limited to, the following:

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided to No-fault Claimants.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills for DME and/or orthotic devices that were never provided to No-fault claimants.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented that the charges for the DME and/or orthotic devices purportedly supplied were the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted delivery receipts in support of their bills that purported to demonstrate the No-fault Claimant's acknowledged receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts were often signed

by the No-fault Claimants in blank or contained forged signatures.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices as part of their proof of claim that systematically failed to provide a meaningful description of the DME and/or orthotic devices purportedly provided (*i.e.*, make and model) and/or additional information that is necessary to determine whether the charges submitted are legitimate.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices reflecting prices far in excess of those actually paid, concealing the manufacturer, make, model, size and quality of the DME and/or orthotic devices purportedly supplied.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the wholesale invoice for any particular item.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, describing the item generically so as to conceal the type of item being prescribed.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol based on a kickback arrangement with No-fault Clinics.

- Unlike legitimate retail DME companies, the Retailers, through their Retail Owners and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics.

- Unlike legitimate retail DME companies, the Retailers were oftentimes shell corporations, with no discernable, formal corporate structure or physical office space.

- Unlike legitimate retail DME companies, the Retailers claimed to conduct their daily operations from locations with no signage or that were shuttered with no indication that any business was conducted at that location.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, entered into illicit relationships with the Wholesale Defendants, which, in exchange for kickbacks

and/or a fee, provided the Retailers with wholesale invoices that fraudulently inflated the price, quantity and/or item provided, with the payments relating to such wholesale invoices actually serving as the vehicle through which Defendants laundered the money back to the Retail Owners through the use of check cashing establishments.

162. In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

163. The members of each enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example, and not limitation, in furtherance of their scheme to defraud, the Retail Owners:

- Entered into kickback arrangements with No-fault Clinics, not named as defendants in this action, to ensure that their associated doctors and/or chiropractors prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment, irrespective of medical necessity;

- Entered into kickback arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;

- Entered into kickback arrangements with one ore more of the Wholesale Defendants so that they would provide inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Submitted or caused to be submitted, on behalf of the Retailers, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many claimants;

- Prepared or caused to be prepared fraudulent bills and sent them to Plaintiffs; and

- Participated, or caused those acting under their direction to participate, in the preparation and mailing of bogus claims, knowing that they contained materially false and misleading information.

164. By way of further example and not limitation, in furtherance of their scheme to defraud, the Wholesale Owners, through the Wholesalers:

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide inexpensive DME and/or orthotic devices, coupled with wholesale invoices that grossly inflated the cost and/or quantity of the DME and/or orthotic devices reflected therein;

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide wholesale invoices that were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone; and

- Prepared or caused to be prepared fraudulent wholesale invoices and sent them to the Retailers, knowing that the Retailers, in turn, would submit them in support of fraudulent claims for reimbursement.

165. By way of further example, in furtherance of the scheme to defraud alleged herein, the Wholesalers:

- Unlike legitimate wholesale DME companies, provided inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Unlike legitimate wholesale DME companies, provided generic, non-descript wholesale invoices that deliberately omitted the make, model and/or manufacturer of the DME and/or orthotic devices to ensure that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone;

- Unlike legitimate wholesale DME companies, provided the essential means through which the Retail Owners were able to submit fraudulent bills to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law;

- Unlike legitimate wholesale DME companies, knew or should have known that the inflated costs and/or quantities of the DME and/or orthotic devices reflected in the wholesale invoices they provided were materially misrepresented in the bills submitted by the Retail Owners, through their respective Retailers, to insurers;

- Unlike legitimate wholesale DME companies, knew or should have known that the generic, non-descript wholesale invoices they provided were used to materially misrepresent the nature, cost and quality of the DME and/or orthotic devices reflected in the bills submitted by the Retail Owners, through their respective Retailers, to insurers;

- Unlike legitimate wholesale DME companies, in furtherance of the money laundering scheme, converted the checks they received from the Retailers to cash and returned to the Retailers up to 98% of the wholesale invoice amounts;

- Unlike legitimate wholesale DME companies, were oftentimes shell corporations, with no discernable, formal corporate structure or physical office space; and

- Unlike legitimate wholesale DME companies, claimed to conduct their daily operations from locations with no signage or that were shuttered with no indication that any business was conducted at that location.

166.    At all relevant times mentioned herein, the Wholesale Owners knew or should have known that the Wholesalers were providing fraudulent wholesale invoices to the Retailers that misstated the price, quantity and quality of the DME and/or orthotic devices purportedly sold to the Retailers.

167.    At all relevant times mentioned herein, the Wholesale Owners, either directly or through others acting under and pursuant to their directions, instructions and control, caused fraudulent wholesale invoices to be provided to the Retailers that they knew or should have known would be used by the Retailers in furtherance of the scheme to defraud alleged herein.

168.    At all relevant times mentioned herein, the Wholesale Owners knew or should have known that the fraudulent wholesale invoices that were provided to the Retailers through the Wholesalers would be used by the Retailers to obtain payment from insurers, in general, and Plaintiffs, in particular, in connection with fraudulent claims.

169.    At all relevant times mentioned herein, the Wholesale Owners, acting in concert with the Retail Owners and their respective Retailers, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

170. At all relevant times mentioned herein, by providing fraudulent wholesale invoices to the Retail Defendants, the Wholesalers provided the essential means in furtherance of the scheme to defraud alleged in this Complaint.

171. At all relevant times mentioned herein, the Retail Owners knew that the wholesale invoices provided by the Wholesale Defendants were fraudulent in that they misstated the price, quantity and quality of the DME and/or orthotic devices purportedly sold to the Retailers.

172. At all relevant times mentioned herein, the Retail Owners, through their respective Retailers, directly or through others acting under and pursuant to their directions, instructions and control, submitted or caused to be submitted the fraudulent wholesale invoices provided by the Wholesale Defendants to Plaintiffs, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

173. At all relevant times mentioned herein, the Retail Owners, acting in concert with their respective Wholesale Defendants, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

174. At all relevant times mentioned herein, the fraudulent wholesale invoices issued by the Wholesale Defendants provided the essential means by which the Retail Owners, through their respective Retailers, were able to further the scheme to defraud alleged in this Complaint.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

175. On information and belief, beginning in 2000 and continuing until the present day, Defendants, and others not named in the Complaint, have engaged in a systematic fraudulent billing scheme based upon the alleged sale of DME and/or orthotic devices.

176. On information and belief, the Retail Owners incorporated, owned and controlled

their respective Retailers for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

177. On information and belief, each of the Retailers, through their respective Retail Owners, engaged in virtually identical and parallel schemes to defraud wherein the Retail Owners (i) paid kickbacks to No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) paid fees (pursuant to the money laundering scheme described below) to the Wholesale Defendants in exchange for fraudulent wholesale invoices that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (iv) arranged for No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Claimants on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Claimants based on medical necessity when, in fact, the Retail Owners, through their respective Retailers, determined the DME that would be prescribed by the No-fault Clinics, with virtually every claimant receiving substantially similar DME and/or orthotic devices.

178. While each DME enterprise alleged in this complaint carried out its scheme to defraud through substantially similar means, in some instances, to avoid suspicion and detection by insurance companies, certain Retail Owners incorporated more than one Retailer that they also owned, controlled and operated. By way of example, and not limitation, Defendant Nazarov incorporated Right Aid Medical Supply, on or about August 20, 2008. Thereafter, on or about January 6, 2010, to avoid the scrutiny of insurance companies, Defendant Nazarov formed

Greenway Medical Supply as a new corporation to replace Right Aid Medical Supply and to carry on the scheme to defraud alleged herein.

179.    Similarly, and in anticipation of the likelihood that Greenway Medical Supply's fraudulent activities would fall under the same scrutiny as Right Aid Medical Supply, Defendant Nazarov formed Active Care Medical Supply on or about July 14, 2010 to replace Greenway Medical Supply, when necessary.  Notwithstanding Nazarov's attempts to avoid suspicion and/or detection by the insurers by establishing new corporate entities, he routinely submitted assignment of benefits forms to insurers, including Plaintiffs, that listed the Retailers he owned, operated and controlled interchangeably.  For instance, in connection with claim number 0175788231, although Active Care Medical purportedly provided the billed for DME, the assignment of benefit form submitted to Plaintiffs in support of Active Care Medical's claim for reimbursement was from Greenway Medical Supply.  Additional examples of the Retailers' interchangeability are evident in billing submitted by Retailer Ideal Medical Supply bearing the Tax Identification Number of another medical supply company, not named in the complaint, and billing submitted by Retailer M&M Complete Equipment for which payments were made to, and accepted by, Retailer Complete Equipment, both of which are owned by Defendant Danilovich.

180.    On information and belief, by way of further example, and not limitation of the interchangeability of the Retailers and the interrelationship between one or more Retail Owners, Comfort Supply submitted an application to the New York City Department of Consumer Affairs ("DOCA") for licensure as a "Dealer in devices for the disabled" wherein Gabriel Yagdarov, who is not a named defendant in this action, but is related to Grisha Yagdarov, the owner of Comfort Supply and Ideal Medical Supply, represented himself to be the sole owner of Comfort Supply in 2005 and was also authorized to act on behalf of Ideal Medical Supply.  Similarly, Ranbow

Medical Supply of N.Y. submitted an application to the New York City DOCA for licensure as a "Dealer in devices for the disabled" wherein Grisha Yagdarov represented himself to be the sole owner of Ranbow Medical Supply of N.Y. in 2005, although barely one year later in 2006, Medzanun Gulkarov represented that he was the sole owner of Ranbow Medical Supply of N.Y. in a similar application.

181. Additional examples of successor Retailers created to avoid scrutiny by insurance companies in furtherance of the scheme to defraud are identified in the table below:

| Retailer | Date Of Incorporation | Dates of Billing | Owner(s) and/or Manager(s) | Office Location |
|---|---|---|---|---|
| Complete Equipment, Inc. | 11/2008 | 01/2009 - 07/2010 | Danilovich | 8776 Bay 16 Street, Brooklyn, NY 11214 |
| M&M Complete Equipment, Inc. | 06/2010 | 07/2010 – 10/2010 | Danilovich & Bogomolny | 1716 Bath Avenue, Brooklyn, NY 11214 |
| Equiplus, Inc. | 10/2010 | 12/2010 – 03/2011 | Danilovich | 1432 Avenue P Brooklyn, NY 11223 |
| | | | | |
| Comfort Supply, Inc. | 07/2005 | 01/2007 – 02/2008 | G. Yadgarov | 69-04 Fresh Meadows Lane, Fresh Meadows, NY 11366 |
| Ideal Supply, Inc. | 11/2007 | 02/2008 – 07/2009 | G. Yadgarov | 116-07 Myrtle Avenue, Richmond Hill, NY 11418 |
| | | | | |
| Right Aid Medical Supply Corp. | 08/2008 | 10/2008 – 02/2010 | Nazarov | 2106 East 23rd Street, Brooklyn, NY 11229 |
| Greenway Medical Supply Corp. | 01/2010 | 05/2010 – 08/2010 | Nazarov | 2570 86th Street Brooklyn, NY 11214 |
| Active Care Medical Supply Corp. | 07/2010 | 07/2010 – 04/2011 | Nazarov | 8100 River Road, Apt. 118 North Bergen, NJ 07047-7205 |

182. On information and belief, in instances where a Retail Owner incorporated more

than one Retailer, when the new Retailer was incorporated, the one incorporated immediately before it was gradually phased out and stopped billing insurance companies, in general, and Plaintiffs, in particular, allowing for only a brief overlap before entirely ceasing to exist.

183.    On information and belief, even in those instances where a Retail Owner incorporated and operated only a single Retailer, the fraudulent blueprint was substantially the same.

184.    On information and belief, in certain instances, the Retail Owners incorporated the Retailers, which remained dormant corporations, until sometime years later, when they sprung to life actively submitting bills for DME and/or orthotic devices pursuant to the scheme to defraud alleged herein. By way of example, and not limitation, Comfort Supply was incorporated on or about July 20, 2005, but did not begin to submit bills to Plaintiffs until January 7, 2009. Similarly, Ranbow Medical Supply of N.Y. was incorporated on or about April 15, 2005, but did not begin to submit bills until July 19, 2008.

185.    On information and belief, with the retail DME defendants in place, Defendants devised, and carried out, fundamentally identical schemes to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were inferior quality and inexpensive items that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

186.    In exchange for kickbacks and/or other financial compensation agreements with the Retailers, one or more No-fault Clinics operating in the New York metropolitan area, through their medical doctors and/or chiropractors, provided the Retailers with prescriptions for DME and/or orthotic devices pursuant to a standard protocol or predetermined course of treatment,

without regard to medical necessity. By way of example, and not limitation, in connection with claim number 0174852251, a No-fault Clinic operating in Nassau County explained to a No-fault Claimant that he would be prescribed a cervical pillow, lumbar support, car seat, bed board and egg crate mattress because all patients receiving treatment at that clinic were prescribed those items of DME.

187. On information and belief, regardless of whether a No-fault Claimant was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics would issue a prescription for a standard battery of DME and/or orthotic devices, regardless of whether such items were medically necessary.

188. On information and belief, irrespective of the purported complaints of pain or type of injury documented in connection with a particular claim, the No-fault Clinics prescribed virtually the exact same DME and/or orthotic devices to its patient population, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

189. On information and belief, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, one or more No-fault Clinics operating in the New York metropolitan area also directed their associated physicians, chiropractors and/or other providers to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, car seats, EMS Units, infrared heat lamps, hot/cold packs, massagers and whirlpools; and to ensure that the prescriptions issued were generic and non-descript, meaning that they omit any detailed description of the items to be supplied to the No-fault Claimants.

190. On information and belief, in furtherance of the scheme to defraud, the No-fault Clinics did not provide the No-fault Claimants directly with the prescriptions for DME and/or orthotic devices. Instead, these prescriptions were given directly to the Retailers to eliminate the possibility that the No-fault Claimant(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

191. On information and belief, in addition to prescribing Non-Fee Schedule Items, as part of the kickback and/or other financial compensation agreement with the No-fault Clinics, the No-fault Clinics routinely provided the Retailers with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, elbow supports, cervical traction units, cervical collars, lumbar cushions and thermophores, which the Retailers then used in support of their claims for reimbursement at a higher rate.

192. On information and belief, by submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, the Retailers were provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly provided.

193. On information and belief, as part of the kickback or other financial compensation agreement with the No-fault Clinics, and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the No-fault Claimants would be given a number of documents to complete and sign, including, but not limited to, assignment of benefits forms and one or more blank delivery receipts. By doing so, the Retailers were able to fill in the DME and/or orthotic devices on the receipts without having to actually provide the items since there is no legitimate acknowledgment of receipt from the No-fault Claimant.

194. At other times, on information and belief, the delivery receipt forms were

completed before the No-fault Claimants were required to sign the forms, meaning that DME and/or orthotic devices were already listed on the forms even before the No-fault Claimant was seen by a doctor.

195.   On information and belief, in certain instances where the No-fault Claimant did not sign the blank delivery receipt, the Retailers forged or caused to be forged the No-fault Claimant's signature.

196.   On information and belief, in furtherance of the scheme to defraud alleged herein, in every instance, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, claim forms, and wholesale invoices submitted by the Retailers in support of their claims for reimbursement.

197.   On information and belief, in furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by the Retailers to Plaintiffs routinely misrepresented the DME and/or orthotic devices provided.

198.   On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers entered into agreements with one or more of the Wholesale Defendants whereby the Wholesale Defendants supplied the Retailers with invoices that were used to document inflated and outrageous wholesale costs, which one or more of the Retailers then submitted to insurers, in general, and Plaintiffs, in particular, as part of their proof of claim.

199.   On information and belief, in furtherance of the scheme to defraud alleged herein, the wholesale invoices provided by the Wholesale Defendants to the Retailers included artificial prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein.

200.   On information and belief, to the extent the Retailers provided any DME and/or

orthotic devices to No-fault Claimants, the DME and/or orthotic devices were inexpensive items that were materially misrepresented in the wholesale invoices received from the Wholesale Defendants.

201.    On information and belief, the wholesale invoices provided by the Wholesale Defendants to the Retailers reflected grossly inflated prices, upwards of 10 to 20 times the actual prices, that the Retailers paid for the DME and/or orthotic devices, when they were actually provided.

202.    On information and belief, in furtherance of the scheme to defraud alleged herein, each of the wholesale invoices provided by the Wholesale Defendants to the Retailers intentionally omitted the make, model, or manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby ensuring that the nature and quality of the item that was supposedly provided could not be verified based on the wholesale invoice alone.

203.    In other instances, on information and belief, the DME and/or orthotic devices reflected in the wholesale invoices provided by the Wholesale Defendants to the Retailers were never provided to the Retailers; rather, the Wholesale Defendants created and provided the wholesale invoices to the Retailers to create the illusion of a sale.

204.    On information and belief, the wholesale invoices were provided to the Retailers to camouflage the conversion of the Retailers' checks payable to the Wholesale Defendants to cash at check cashing establishments.

205.    On information and belief, the Retailers would issue checks to the Wholesale Defendants for the full amount of the inflated wholesale invoice. The Wholesale Defendants would then convert the checks to cash through check cashing establishments, or by other means, and would return a substantial portion of the money to the Retailers, keeping a portion of the

profits of the scheme for themselves.

206. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers requested that the Wholesale Defendants have their checks cashed on their corporate accounts to fraudulently demonstrate to insurers, such as Plaintiffs, that they paid for the wholesale items, when, in fact, they did not.

207. On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, delivery receipts and wholesale invoices that materially misrepresented the nature, quality and cost of the DME and/or orthotic devices purportedly provided to No-fault Claimants.

208. On information and belief, the Wholesale Defendants and No-fault Clinics provided the means through which the Defendants were able to execute their scheme to defraud.

209. On information and belief, the fraudulent wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers, in general, and Plaintiffs, in particular, to obtain reimbursement under the No-fault Law in excess of the actual cost of the DME and/or orthotic devices purportedly provided.

210. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault law for expensive DME and/or orthotic devices that were never actually provided, or not provided as billed and/or if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

211. On information and belief, in many cases, the Retailer Owners, through their Retailers, never actually provided the DME for which they billed Plaintiffs. By way of example

and not limitation, Exhibit "8 in the accompanying Compendium of Exhibits is a spreadsheet identifying a representative sample of claims in which claimant testified during an EUO that they did not receive the DME for which one or more of the Retailers submitted bills to Plaintiffs.

212.    On information and belief, in furtherance of the scheme to defraud alleged herein, like the wholesale invoices, the Retailers' bills intentionally omitted the make, model, and manufacturer of the DME and/or orthotic devices purportedly provided to No-fault Claimants in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

213.    On information and belief, in furtherance of the scheme to defraud alleged herein, upon receiving the fraudulent wholesale invoices from the Wholesale Defendants, the Retailers as a matter of pattern and practice, generated and submitted bills to Plaintiffs knowingly misrepresenting the actual amounts that they paid for DME and/or orthotic devices.

214.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, including Active Care Medical Supply, A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Comfort Supply, Complete Equipment, Cortland Medical Supply, Equiplus, Expo Supply, Greenway Medical Supply, GY Medical Supply, Ideal Medical Supply, Linden Equipment, M&M Complete Equipment, Metro 8 Medical Equipment, Metro Health Products, Metropolitan Medical Supplies, National Medical & Surgical Supply, Power Supply, Quest Supply, Right Aid Medical Supply, SK Prime Medical Supply, Sky Medical Supply, U&R City Supplies, Village Medical Supply and Wiolla Medical Supply, submitted bills to Plaintiffs wherein they misrepresented that certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, they were utilizing phantom

codes for which there was no published fee schedule. In doing so, the Retail Owners, through their respective Retailers, materially misrepresented the nature, quality and cost of the billed for DME and/or orthotic device and deliberately misrepresented the amounts they were entitled to receive under the No-fault Law. By way of example and not limitation, codes E0941, E1310 and E0217 were each used on bills submitted by Retailers, including Active Care Medical Supply, A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Comfort Supply, Cortland Medical Supply, Equiplus, Expo Supply, Greenway Medical Supply, GY Medical Supply, Ideal Medical Supply, Metro Health Products, Metropolitan Medical Supplies, National Medical & Surgical Supply, Power Supply, Quest Supply, Right Aid Medical Supply, SK Prime Medical Supply, Sky Medical Supply, U&R City Supplies, Village Medical Supply and Wiolla Medical Supply, to Plaintiffs for reimbursement even though none of these codes are recognized in the Fee Schedule. By way of further example, and not limitation, Exhibit "9" in the accompanying Compendium of Exhibits is a representative sample of claims in which one or more of the Retailers submitted bills containing codes not recognized in the Fee Schedule.

215. On information and belief, in furtherance of the scheme to defraud alleged herein and in contravention of Regulation 83, which provides, among other things, that where the New York State Medicaid program has not established a fee payable for the specific durable medical item, the fee shall be the lesser of (1) the acquisition cost to the provider, plus 50% or (2) the usual and customary price charged to the general public, the Retailers routinely and knowingly generated and submitted bills wherein they materially misrepresented that the fee(s) charged reflected the lesser of their acquisition costs (plus 50%) or the actual and customary price charged to the general public to maximize their reimbursement under the No-fault Law.

216. On information and belief, separate and apart from submitting bills using codes that are not recognized in the Fee Schedule, as more fully set forth in the Fee Schedule Scheme to Defraud Section below, the Retailers routinely submitted bills to Plaintiffs for items that were never provided and/or that contained Fee Schedule code descriptions that failed to correspond with the equipment purportedly being provided. By way of example and not limitation, under claim number 0172287377, Defendant Brand Medical Supply billed Plaintiffs $282.68 using code E2611, a Fee Schedule code reserved for "general use wheelchair back cushion," when it did not provide such DME.. By way of further example and not limitation, in connection with claim numbers 0152769105, 0155215411, and 0157748948, Defendant Cortland Medical Supply billed for a "general use wheelchair back cushion" using code E2611 for $282.68, when it did not provide such DME.

217. On information and belief, in furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, each and every bill submitted by the Retailers deliberately obscured all identifying information relating to the billed for DME and/or orthotic devices so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

218. On information and belief, in furtherance of the scheme to defraud alleged herein, with the exception of Complete Equipment, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, such as LSOs, knee, wrist, elbow, and shoulder braces that were never provided. In other instances, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive DME and/or orthotic devices that required a

fitting and/or adjustment that they never performed.  By way of example, and not limitation, Exhibit "10" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims in which the Retail Owners, through their respective Retailers, billed for expensive custom fabricated DME and/or orthotic devices that were never provided. In addition, Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims in which the Retail Owners, through their respective Retailers, billed for supports and/or braces that required fitting and adjustments, which they never performed.

219.    On information and belief, Defendants' activity promoted and facilitated other acts that incurred costs to Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath and associated attorneys' and court reporting fees, independent medical examinations ("IME") and peer reviews.

## THE NON-FEE SCHEDULE SCHEME TO DEFRAUD

**1.      Fraudulent Billing Under Phantom Codes Not Recognized in the Fee Schedule**

220.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills for Non-Fee Schedule items, such as EMS Units, massagers, whirlpool baths and water heat and cold circulation units, wherein they misrepresented that those items were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, they were utilizing phantom codes that were not listed on the relevant Fee Schedule.  By way of example, and not limitation, the Retail Owners, through their respective Retailers, including A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Comfort Supply, Cortland Medical Supply, Equiplus, Expo Supply, GY Medical Supply, Ideal Medical

Supply, Linden Equipment, Metropolitan Medical Supplies, National Medical & Surgical Supply, Power Supply, SK Prime Medical Supply, Sky Medical Supply, U&R City Supplies, Village Medical Supply and Wiolla Medical Supply, routinely submitted bills to Plaintiffs for "whirlpools," using phantom codes E1210, E1300 and E1310, which were not recognized under the relevant Fee Schedule in existence at the time, in amounts ranging from $240.00 to $570.00, notwithstanding that to the extent anything was provided, the whirlpools are inexpensive "jet spas," which should have been billed at no more than $60.00. Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for whirlpools using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

221.    On information and belief, by billing under the phantom codes for the whirlpools, the Retail Owners, through their respective Retailers, billed and were paid roughly four to nine times more than they would have otherwise have been entitled to receive under the No-fault Law.

222.    By way of further example and not limitation, the Retail Owners, through their respective Retailers, including Active Care Medical Supply, A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Cortland Medical Supply, Expo Supply, Greenway Medical Supply, GY Medical Supply, Ideal Medical Supply, Metro Health Products, Metropolitan Medical Supplies, National Medical & Surgical Supply, Power Supply, Quest Supply, Right Aid Medical Supply, SK Prime Medical Supply, Sky Medical Supply, U&R City Supplies and Village Medical Supply, routinely submitted bills to Plaintiffs for "Water Heat and Cold Circulation Units," using phantoms codes E0217 and E0237, which are not recognized in the Fee Schedule, in amounts in excess of $690.00, notwithstanding that, to the extent anything was provided, the water circulating units and pads were aqua relief

systems that should have been billed at no more than $200.00. Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for a water circulation unit using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

223. On information and belief, by billing under the phantom codes for the water circulation units, the Retail Owners, through their respective Retailers, billed and were paid up to three times what they would have otherwise have been entitled to receive under the No-fault Law.

224. On information and belief, separate and apart from billing for whirlpools and water circulation units under phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, routinely submitted bills for other Non-Fee Schedule items using phantom codes that are not recognized in the Fee Schedule, in which they materially misrepresented that the items were reimbursable under the relevant Fee Schedule in existence at the time and the amount they were entitled to receive. By way of example, and not limitation:

> • The Retail Owners, through their respective Retailers, including A-Quality Medical Supply, Bright Medical Supply, CMS Medical Supply, Comfort Supply, Cortland Medical Supply, Expo Supply, Ideal Medical Supply, Linden Equipment, M&M Complete Equipment, Metro 8 Medical Equipment, National Medical & Surgical Supply, U&R City Supplies and Village Medical Supply, routinely submitted bills to Plaintiffs for "bed boards" in amounts ranging from $101.85 to $185 using phantom code E0273 and/or E0315, notwithstanding that to the extent any DME was provided, the bed board purportedly supplied was an inexpensive, thin piece of foldable cardboard or other material, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $40.00. Exhibit "14" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for bed boards using a phantom code not

recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, CMS Medical Supply, Comfort Supply, Cortland Medical Supply, Expo Supply, GY Medical Supply, Ideal Medical Supply, Metropolitan Medical Supplies, National Medical & Surgical Supply, SK Prime Medical Supply, U&R City Supplies and Village Medical Supply, routinely submitted bills to Plaintiffs for "car seats" in amounts ranging from $134.24 to $297.00 using phantom codes M1005, E5354 and L0300, notwithstanding that to the extent any DME was provided, the car seats purportedly provided were actually inexpensive bubble pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $13.00. Exhibit "15" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for car seats using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Comfort Supply, Complete Equipment, Comfort Supply, Cortland Medical Supply, Equiplus, Expo Supply, GY Medical Supply, Ideal Medical Supply, M&M Complete Equipment, National Medical & Surgical Supply, Power Supply, Sky Medical Supply, U&R City Supplies, Village Medical Supply and Wiolla Medical Supply, routinely submitted bills to Plaintiffs for E.M.S. Unit Four Leads ("EMS Units"), using phantom codes E0744 and E0745 in amounts ranging from $525 to $816.50, notwithstanding that to the extent anything was provided, the EMS Units, Accessory Kits, and Placement Belts are actually cheap "digital therapy machines" and/or TENS Units, reimbursable, if at all, as Non-Fee Schedule items, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "16" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for EMS units using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, except for Equiplus, Heel to Toe Foot Center, Linden Equipment and Ranbow Supply of N.Y., routinely submitted bills to Plaintiffs for "infrared heat lamps" in amounts in ranging from $129.37 to $223.50 using phantom codes E0200, E0221 and E0205, notwithstanding that to the extent any DME was provided, the infrared heat lamps purportedly provided were actually cheap, hand held heat lamps,

reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $20.00. Exhibit "17" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for infrared heat lamps using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including Active Care Medical Supply, A-Quality Medical Supply, Right Aid Medical Supply, SK Prime Medical Supply and U&R City Supplies, routinely submitted bills to Plaintiffs for "hot/cold packs" in amounts ranging from $45.00 to $176.00 using phantom codes E9999 and S1001, notwithstanding that to the extent any DME was provided, the infrared hot/cold packs were inexpensive items, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $5.00. Exhibit "18" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for hot/cold packs using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including Armada Medical Supply, Bright Medical Supply, Complete Equipment, Cortland Medical Supply, Metropolitan Medical Supply, National Medical & Surgical Supply and Village Medical Supply, routinely submitted bills to Plaintiffs for "vibrating deep heat massagers" and/or "back massagers" in the amount of $189.00 using phantom codes 99070, notwithstanding that to the extent any DME was provided, the massagers purportedly provided were actually simple, hand held massagers, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $20.00. Exhibit "19" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for massagers using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including Brand Medical Supply, Bright Medical Supply, Cortland Medical Supply, Village Medical Supply and Wiolla Medical Supply, routinely submitted bills to Plaintiffs for "TENS accessory kits" in amounts ranging from $56.00 to $57.00 using phantom code A4558, notwithstanding that to the extent any DME was provided, the accessory kit purportedly provided was a simple box with conductive gel, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general

public is no more than $17.00. Exhibit "20" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for TENS accessory Kits using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Cortland Medical Supply, Ideal Medical Supply, National Medical & Surgical Supply, Sky Medical Supply and Village Medical Supply, routinely submitted bills to Plaintiffs for "Pads for Water Circulating Units" in amounts ranging from $80.00 to $136.92 using phantom code E0249, notwithstanding that to the extent any DME was provided, the pads purportedly provided were inexpensive plastic bags, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "21" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for pads for water circulating units using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including Brand Medical Supply, Bright Medical Supply, Comfort Supply, Cortland Medical Supply, Equiplus, Ideal Medical Supply, Metro Health Product, Metropolitan Medical Supplies, National Medical & Surgical Supply, SK Prime Medical Supply, Sky Medical Supply, Village Medical Supply and Wiolla Medical Supply, routinely submitted bills to Plaintiffs for "EMS/TENS Placement Belts" in amounts ranging from $30.00 to $82.50 using phantom code E0731, notwithstanding that to the extent any DME was provided, the belts were thin cloth wraps lacking electrode pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $15.00. Exhibit "22" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for EMS/TENS placement belts using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including Armada Medical Supply, CMS Medical Supply, Expo Supply, GY Medical Supply, Ideal Medical Supply, National Medical & Surgical Supply and Wiolla Medical Supply, routinely submitted bills to Plaintiffs for "cervical pillows" in amounts ranging from $26.75 to $247.50 using phantom code E0943, notwithstanding that to the extent any DME was provided, the cervical pillows purportedly

supplied were simple cushions, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $8.00. Exhibit "23" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for cervical pillows using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including Armada Medical Supply, Cortland Medical Supply, Ideal Medical Supply, National Medical & Surgical Supply, SK Prime Medical Supply and Village Medical Supply, routinely submitted bills to Plaintiffs for "thermophores" and/or "electric heat pads" in the amount of $78.99 using phantom code Z2304, notwithstanding that to the extent any DME was provided, the DME purportedly supplied were simple and inexpensive heating pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $10.00. Exhibit "24" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers submitted bills for thermophores and/or electric heat pads using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

225. By submitting to Plaintiffs bills that contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, deliberately misrepresented that their bills reflected either a reimbursement amount set by the Fee Schedule, or alternatively that their bills reflected the lesser of their acquisition cost, plus 50% or the usual and customary price for the public, when in reality, to the extent anything was provided, the items did not have a Fee Schedule code and the Retail Owners, through their respective Retailers, were entitled to receive only a fraction of the amount reflected in their bills.

226. Consequently, by submitting to Plaintiffs bills that contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, deliberately misrepresented the amounts that they were entitled to receive and deceived Plaintiffs, among others, into paying many times over what they would

72

have otherwise been entitled to receive under the No-fault Law, when, in reality, to the extent any DME and/or orthotic device was provided at all, the Retail Owners, through their respective Retailers, were entitled to receive only a fraction of the amount reflected in their bills.

227. On information and belief, in addition to containing phantom codes that are not recognized under the relevant Fee Schedule in existence at the time, the Retailers' bills routinely contained grossly inflated charges, supported by fraudulent wholesale invoices, for DME and/or orthotic devices that were inexpensive and of poor quality.

**2.      Fraudulent Billing Using Code 1399**

228. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills for Non-Fee Schedule items using Fee Schedule code E1399, which is reserved for miscellaneous items, in which bills they materially misrepresented the nature and quality of the billed for DME and/or orthotic devices and their acquisition costs.

229. By way of example, and not limitation, on information and belief:

- In connection with claim numbers 000172881286-02, 000172881286-03, 000172933277-05, and 000174069468-05, Defendant M&M Complete Equipment submitted bills to Plaintiffs for bed boards using code E1399, in the amount of $108.00, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the bed boards were inexpensive, thin pieces of cardboard or other material for which the usual and customary price charged to the general public did not exceed $40.00.

- In connection with claim numbers 000155392459-06 and 000157661273-01, Defendant Expo Supply submitted bills to Plaintiffs for cervical traction units using code E1399, in the amount of $639.00, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the cervical traction units were cheap knock-offs of the Posture Pro item for which the

legitimate wholesale costs did not exceed $65.00, and, therefore, should have been billed at no more than $97.50.

- In connection with claim numbers 000138752944-01, Defendant Complete Equipment submitted bills to Plaintiffs for EMS/TENS placement belts using code E1399, in the amount of $70, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the EMS/TENS placement belts were cheap belts for which the usual and customary price charged to the general public did not exceed $15.00.

- In connection with claim numbers 000189450851-01, 000191708437-01, 000191708437-03, 000191714922-01, 000191714922-03, 000193644721-03, 000193900628-03, 000194838538-01 and 000195147327-04, Defendant Linden Equipment submitted bills to Plaintiffs for infrared heating lamps using code E1399, in the amount of $175.50, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the infrared heating lamps were cheap, hand-held items for which the usual and customary price charged to the general public is $20.00.

- In connection with claim numbers 000107536401-02, 000108183203-01, 000109155838-07, 000110684594-03, 000112503495-03, 000113049134-01 and 000113225353-04, Defendant A-Quality Medical Supply submitted bills to Plaintiffs for mattresses using code E1399, in the amount of $197.50, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the mattresses were cheap, eggcrate foam mattresses for which the usual and customary price charged to the general public did not exceed $37.00.

- In connection with claim numbers 000124402355-01, 000139206916-04, 000139463863-03, 000140916735-01, 000142990126-02, 000142990126-03 and 000144300563-01, Defendant Brand Medical Supply submitted bills to Plaintiffs for thermophores using code E1399, in the amount of $78.99, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the thermophores were inexpensive heat pads for which the usual and customary price charged to the

general public did not exceed $10.00.

- In connection with claim numbers 000160485330-03, 000160861167-01, 000160922779-01, 000161434329-04, 000161434329-05, 000161600242-01, 000165298885-03 and 000165298885-04, Defendant National Medical & Surgical Supply submitted bills to Plaintiffs for water heat and cold circulation units using code E1399, in the amount of $544.00, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the water circulation units were basic aqua relief systems for which the usual and customary price charged to the general public did not exceed $200.00. By way of further example and not limitation, in connection with claim numbers 000185994639-07, 000188628457-03 and 000195686407-07, Defendant Metro 8 Medical Equipment submitted bills to Plaintiffs for water circulating cold pads with pumps using code E1399, in the amount of $515.00, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the water circulating cold pads with pumps were basic aqua relief systems for which the usual and customary price charged to the general public did not exceed $200.00.

230. By way of further example, and not limitation, the Retail Owners, through their respective Retailers, including Active Care Medical Supply, A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, CMS Medical Supply, Equiplus, Expo Supply, Greenway Medical Supply, GY Medical Supply, Ideal Medical Supply, Linden Equipment, M&M Complete Equipment, Metro 8 Medical Equipment, Metropolitan Medical Supplies, National Medical & Surgical Supply, Power Supply, Right Aid Medical Supply, SK Prime Medical Supply, Sky Medical Supply, U&R City Supplies and Wiolla Medical Supply, routinely submitted bills to Plaintiffs for massagers using code E1399, in amounts ranging from $165.50 to $199.95, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the massagers were simple, hand held massagers

for which the usual and customary price charged to the general public did not exceed $20.00. Exhibit "25" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers materially misrepresented the nature and quality of the massagers billed for and their acquisition costs, submitting bills for massagers under code E1399.

231.    Additional examples of various DME billed by the Retail Owners, through their respective Retailers, using the code E1399 are identified in the table below and the corresponding exhibit in the Compendium of Exhibits as indicated below:

| DME Description Used | Submitted Bills - Price Ranges | Item Likely Provided | Usual & Customary Price Charged to General Public | Retailer Billing for Item | Exhibit Number |
|---|---|---|---|---|---|
| Car Seat | $145 - $195 | Inexpensive bubble pads | $13.00 | Brand Medical Supply, Bright Medical Supply, Linden Equipment, M&M Complete Equipment, Metro 8 Medical Equipment, Power Supply, Village Medical Supply and Wiolla Medical Supply | 26 |
| EMS Unit Four Leads | $570.75 - $769.50 | Cheap "digital therapy" machines or TENS Units | $30.00 | Active Care Medical Supply, CMS Medical Supply, Expo Supply, Greenway Medical Supply, Linden Equipment, Metro 8 Medical Equipment, Metropolitan Medical Supplies, Power Supply, Right Aid Medical Supply and SK Prime Medical Supply | 27 |

| DME Description Used | Submitted Bills - Price Ranges | Item Likely Provided | Usual & Customary Price Charged to General Public | Retailer Billing for Item | Exhibit Number |
|---|---|---|---|---|---|
| Hot-Cold Pack | $20 - $91.50 | Inexpensive, one-time use hot-cold pack | $5.00 | CMS Medical Supply, Comfort Supply, Cortland Medical Supply, Expo Supply, GY Medical Supply, Ideal Medical Supply, Metro 8 Medical Equipment, Metropolitan Medical Supplies, Power Supply, SK Prime Medical Supply, U&R City Supplies and Wiolla Medical Supply | 28 |
| Hydrotherapy Whirlpool | $409 - $628 | Inexpensive jet spas | $60.00 | Active Care Medical Supply , Complete Equipment, Greenway Medical Supply M&M Complete Equipment and Right Aid Medical Supply | 29 |
| Lumbar Cushion | $22.04 - $55 | Inexpensive pillow/ cushion | $10.00 | A-Quality Medical Supply, Bright Medical Supply, CMS Medical Supply, Comfort Supply, Expo Supply, Ideal Medical Supply, Metropolitan Medical Supplies, Power Supply, Ranbow Supply of N.Y. and SK Prime Medical Supply | 30 |

3.      **Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes**

232.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule Items using codes reserved for Fee Schedule Items in order to maximize the fraudulent charges they could submit to Plaintiffs, despite the fact that they never provided the

billed for items. By way of example and not limitation, the Retail Owners, through their respective Retailers, including Active Care Medical Supply, A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Comfort Supply, Cortland Medical Supply, Expo Supply, GY Medical Supply, Greenway Medical Supply, Ideal Medical Supply, Linden Equipment, M&M Complete Equipment, Metro 8 Medical Equipment, Metropolitan Medical Supplies, Metro Health Products, National Medical & Surgical Supply, Power Supply, Quest Supply, Right Aid Medical Supply, SK Prime Medical Supply, U&R City Supplies, Village Medical Supply and Wiolla Medical Supply, routinely submitted bills to Plaintiffs for "egg crate mattresses," which is a Non-Fee Schedule Item, using the Fee Schedule code E0272, which is reserved for a "Foam Rubber Mattress" with a fee of $97.50 or $155.67, depending on the year the DME was provided and/or Fee Schedule code E0184, which is reserved for "Dry Pressure Mattresses" with a fee of $153.15.

233. On information and belief, the Retailers never provided a foam rubber mattress to any No-fault Claimant.

234. On information and belief, the Retailers never provided a Dry Pressure Mattress to any No-fault Claimant.

235. On information and belief, to the extent any DME and/or orthotic device was provided, the Retailers provided simple bubble mattress pads, which they described as "egg crate mattresses," for which the usual and customary price charged to the general public did not exceed $37.00.

236. On information and belief, by submitting bills using codes E0272 and/or E0184, the Retail Owners, through their respective Retailers, materially misrepresented that they provided foam rubber or dry pressure mattresses, when they did not, and also materially

misrepresented that the item purportedly provided was a Fee Schedule item and sought reimbursement in amounts upwards of four times over what would otherwise have been a permissible charge for the Non-Fee Schedule item. Exhibit "31" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers materially misrepresented the nature and quality of the egg crate mattresses billed for and their acquisition costs by billing for the Non-Fee Schedule DME under a Fee Schedule code.

237. By way of further example and not limitation, the Retail Owners, through their respective Retailers, including Active Care Medical Supply, A-Quality Medical Supply, Armada Medical Supply, Brand Medical Supply, Bright Medical Supply, CMS Medical Supply, Comfort Supply, Cortland Medical Supply, Expo Supply, Greenway Medical Supply, GY Medical Supply, Ideal Medical Supply, Linden Equipment, Metro 8 Medical Equipment, Metro Health Products, Metropolitan Medical Supplies, National Medical & Surgical Supply, Power Supply, Quest Supply, Right Aid Medical Supply, SK Prime Medical Supply, U&R City Supplies, Village Medical Supply and Wiolla Medical Supply, routinely submitted bills to Plaintiffs for "bed boards," which is a Non-Fee Schedule item, using code E0274, which is reserved for a "Table, Overbed," a Fee Schedule item with a fee of $101.85.

238. On information and belief, the Retailers never provided an overbed table to any No-fault Claimant.

239. On information and belief, to the extent any DME and/or orthotic device was provided, the Retailers provided inexpensive, thin pieces of foldable cardboard or other material, which they described as "bed boards," for which the usual and customary price charged to the general public did not exceed $40.00.

240. On information and belief, by submitting bills using code E0274, the Retail Owners, through their respective Retailers, materially misrepresented that they provided overbed tables, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item and sought reimbursement in amounts more than two times over what would otherwise have been a permissible charge for the Non-Fee Schedule item. Exhibit "32" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers materially misrepresented the nature and quality of the bed boards billed for and their acquisition costs by billing for the non-Fee Schedule DME under a Fee Schedule code.

241. By way of further example and not limitation, the Retail Owners, through their respective Retailers, including Active Care Medical Supply, Greenway Medical Supply and Right Aid Medical Supply, routinely submitted bills to Plaintiffs for "orthopedic car seats," which is a Non-Fee Schedule item, using code T5001, which is reserved for a "Positioning seat for persons with special orthopedic needs," a Fee Schedule item with a fee ranging from $513.75 to $609.75, depending on the year the DME was provided.

242. On information and belief, the Retailers never provided a positioning seat for persons with special orthopedic needs to any No-fault Claimant.

243. On information and belief, to the extent any DME and/or orthotic device was provided, the Retailers provided inexpensive, cheap bubble pads, which they described as "orthopedic car seats," for which the usual and customary price charged to the general public did not exceed $13.00.

244. On information and belief, by submitting bills using code T5001, the Retail Owners, through their respective Retailers, materially misrepresented that they provided